CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

12/1/2021

JULIA C. DUDLEY, CLERK
BY: s/ A. Little
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| EVA PALMER,<br><br>                    *Plaintiff*,<br><br>v.<br><br>LIBERTY UNIVERSITY, INC.,<br><br>                    *Defendant.* | CASE NO. 6:20-cv-31<br><br>MEMORANDUM OPINION<br>& ORDER<br><br>JUDGE NORMAN K. MOON |

      This matter comes before the Court on Plaintiff Eva Palmer's and Defendant Liberty University, Inc.'s cross-motions for summary judgment on the applicability of the ministerial exception to Palmer's allegation that Liberty wrongfully terminated her employment in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621, *et seq.*, Dkt. 13, 14.

      Palmer taught art classes at Liberty for over 30 years, from 1986 to 2018. Dkt. 15-1 at ¶ 12. She taught under a variety of position titles, ending as Professor of Art in the Studio and Digital Arts Department of the School of Visual and Performing Arts. *Id.* at ¶ 29–30. In April 2018, Liberty informed Palmer that it would not renew her contract for the following academic year. *Id.* at ¶ 12. Palmer immediately appealed the decision, and Liberty officials told her after a multi-level review process that its decision was performance-based, and therefore denied her appeal. Dkt. 1 at ¶ 14.

      Palmer alleges that Liberty's proffered reason for not renewing her contract was a pretext for age-based discrimination. *Id.* at ¶ 16. In support of her claim, she alleges that Liberty replaced her with a younger employee who was "far less qualified and far less experienced." *Id.*

1

at ¶ 17. She also alleges that Liberty did not renew the contracts of several other "older" educators contemporaneously with its decision not to renew hers. *Id.* at ¶ 18.

Now, both parties have filed cross-motions for summary judgment on the issue of the ministerial exception. Dkt. 13, 14. The ministerial exception shields religious employers from anti-discrimination law for employment decisions regarding "ministers." *See Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012). The Supreme Court has recently held that the ministerial exception applies to certain teachers at religious schools in *Hosanna-Tabor* and *Our Lady of Guadalupe v. Morrissey-Berru*, 591 U.S. ___; 140 S. Ct. 2049 (2020). Accordingly, Liberty now moves that the Court hold as a matter of law that the ministerial exception applies to its decision not to renew Palmer's contract. *See* Dkt. 13. Palmer moves the Court to hold the reverse—that the ministerial exception does not apply to her case as a matter of law. *See* Dkt. 14.

For the reasons laid out below, the Court holds that Palmer was not a "minister" within the meaning of the exception, and therefore will grant Palmer's motion and deny Liberty's.

## I. LEGAL STANDARD

### A. The Ministerial Exception

The ministerial exception bars the application of anti-discrimination law to religious institutions' employment decisions regarding "ministers." Following a series of lower court decisions recognizing a religious exemption from anti-discrimination claims, the Supreme Court first embraced the ministerial exception in *Hosanna-Tabor Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012). In that case, the Court held that a teacher was barred from suing her employer, a church with an affiliated religious school, because she was a "minister." The Court explained that the exception arose from both the Free Exercise Clause and the Establishment

Clause—that the Free Exercise Clause safeguards religious institutions' "right to shape [their] own faith and mission through [their] appointments," and that the Establishment Clause prohibits "government involvement in [] ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 188. Considering those two principles together, the Court held that anti-discrimination law does not govern religious institutions' employment decisions regarding ministers. *Id*. at 189–190.

After settling the question of whether religious institutions were exempt from anti-discrimination law with respect to employment decisions regarding ministers, the Court turned to the issue of whether the plaintiff in question was in fact a "minister." Although the Court declined to adopt a "rigid formula" for determining which employees are ministers, it found compelling that the plaintiff (1) was held out as a minister and given a ministerial title, (2) had undertaken a "significant degree of religious training," (3) held herself out as a minister, even claiming special housing allowances for ministers on her taxes, and (4) performed significant religious functions, including playing "a role in conveying the Church's message and carrying out its mission." *Id*. at 191–192. With those considerations in mind, the Court held that the plaintiff was a "minister" within the meaning of the exception. *Id*. at 194.

The Supreme Court further expanded the scope of the ministerial exception in *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. ___; 140 S. Ct. 2049 (2020). The opinion involved two consolidated cases in which Catholic primary schools fired teachers for allegedly discriminatory reasons. In the first case, a teacher at a Catholic elementary school in Los Angeles brought an ADA claim when the school refused to renew her contract shortly after she requested time off to undergo treatment for breast cancer. *Our Lady of Guadalupe*, 140 S. Ct. at 2058–2059. In the second case, a teacher at another Catholic elementary school in Los Angeles brought

3

an ADEA claim after the school moved her from a full-time to a part-time position and replaced her with a younger teacher. *Id*. at 2057–2058.

The Court held that both plaintiffs were ministers within the meaning of the exception, and thus that they could not proceed on their anti-discrimination claims. *Id*. at 2055. The Court again referenced the four considerations laid out in *Hosanna-Tabor*: the employee's title, her religious training, how she held herself out, and what functions she performed. *Id*. at 2062. But the Court emphasized that what was most important is "what an employee does." *Id*. at 2064. The Court noted that both teachers were employed under similar agreements to promote the Catholic faith, instruct students in religious worship, and personally model the schools' values. *Id*. at 2058–2060. The Court also noted that both teachers taught religion courses for part of the day, frequently prayed with their students, and brought their students to worship services. *Id*. The Court held that the absence of the word "minister" in the teachers' titles was not dispositive, nor was their lack of formal religious education relative to the plaintiff in *Hosanna-Tabor*. *Id*. at 2063–2064. The Court concluded that the four considerations in *Hosanna-Tabor* were not "factors to be assessed and weighed in every case," but rather a set of more general guidelines to determine whether the plaintiff was a minister. *Id*. at 2068.

### B. Summary Judgment and the Ministerial Exception

Lower courts have broken the ministerial exception into two closely related questions: first, whether the employer is a religious institution covered by the rule, and second, whether the plaintiff is a minister within the rule's meaning. *See, e.g.*, *Lishu Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803, 812 (D.S.C. 2018) ("In order for the ministerial exception to apply, an employer must be a religious institution, and an employee must be a minster."). Both issues are "pure question[s] of law," which the Court "must determine for itself." *Conlon v. InterVarsity*

*Christian Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015); *accord Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 608–609 (Ky. 2014) ("[T]he determination of whether an employee of a religious institution is a ministerial employee is a question of law for the trial court, to be handled as a threshold matter.").

Summary judgment is the stage of the proceedings at which the Court must decide whether the exception applies. The Supreme Court held in *Hosanna-Tabor* that the exception is an affirmative defense, not a jurisdictional bar. *Hosanna-Tabor*, 565 U.S. at 194, n. 4. Ordinarily, affirmative defenses are pled in the answer and then resolved by a motion for summary judgment. *See* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ."); Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."). In short, "summary judgment will almost invariably be the appropriate mechanism for deciding whether the exception applies." Peter J. Smith and Robert W. Tuttle, *Civil Procedure and the Ministerial Exception*, 86 FORDHAM L. REV. 1847, 1867 (2018).

Federal Rule of Civil Procedure 56(a) provides that a court should award summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If,

however, the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

## II. FACTUAL BACKGROUND

Eva Palmer taught at Liberty University from 1986 to 2018. Dkt. 15-1 at ¶ 12. Over the years, she taught art classes under a variety of position titles, ending as Full Professor in the Studio and Digital Arts Department of Liberty's School of Visual and Performing Arts. *Id.* ¶ 27. On April 18, 2018, Palmer received a letter from Liberty stating that it would not be renewing her employment contract for the following academic year. Dkt. 1 at ¶ 9. Palmer immediately appealed the decision and had several meetings with Liberty officials. Eventually, Liberty's Interim Provost told her that the university had not renewed her contract for performance reasons. *Id.* at ¶ 14.

Palmer's educational background is largely secular. She holds a B.S. Ed. with a concentration in art, and two master's degrees in fine art. Dkt. 15-1 at ¶¶ 3–5. She has no graduate or post-graduate degrees in religion, theology, or ministry, although she did complete some coursework in Liberty's Doctor of Ministry Program, from which she did not obtain a degree. *Id.* at ¶ 6, Dkt. 22-2 at 37–38. Palmer claims that this coursework was for her personal spiritual development (Dkt. 22 at 8), and no evidence in the record indicates that Liberty required her to complete it for her job. Furthermore, Palmer is not, and has never been, an ordained minister. Dkt. 15-1 at ¶ 7.

At the core of Palmer's daily responsibilities was teaching art classes on subjects like drawing and sculpture. *Id.* at ¶¶ 26–32. For a brief time in the mid-1990s, she also taught humanities courses. *Id.* at ¶ 26. She concedes that she began each class with a short prayer or psalm reading, but she did not otherwise integrate Christian lessons into her classes. *Id.* at ¶ 39. Occasionally, her art lessons would reflect Biblical stories or lessons—such as one effort to "compare[] her pottery and ceramics to certain Biblical lessons learned in Jeremiah 18," but this was not, apparently, the norm. *See* Dkt. 15-1 at ¶¶ 26–39.

Outside of class, Palmer did not significantly participate in her students' spiritual lives. She did not bring her students to church services. *Id.* at ¶ 37. She occasionally counseled them on personal matters outside the immediate scope of her teaching duties, and would have periodic conversations about spirituality with students, but she never led them in Bible study, guided them in scripture, or gave them sermons. *Id.* at ¶¶ 26–30; Dkt. 13-2 at ¶¶ 21–23.

Liberty is a Christian university, and places some demands on its faculty and staff to uphold its values. Dkt. 13-2 at ¶¶ 1–16. The school was founded under the auspices of the Southern Baptist faith, and its stated purpose is to "promot[e] the synthesis of academic knowledge and a Christian worldview." *Id.* at ¶ 5. It has a set of generally applicable policies that codify its Christian values, and screens applicants for teaching positions based on their commitment to those values (although the current screening system was not in place when Liberty hired Palmer in the 1980s). *Id.* at ¶¶ 1–16. When faculty members first begin teaching at the school and at the beginning of each semester thereafter, Liberty requires that they complete faith-based workshops through Liberty's Center for Teaching Excellence, which "assist[s] faculty in integrating the Christian worldview into the classroom." *Id.* at ¶ 11. While Liberty faculty are not "expressly required to engage in specific religious conduct in the classroom, such

as praying with students, reading Bible verses, holding devotionals, [or] attending services with students," Liberty asserts that faculty are given "the tools and substantial authority" to impose religious lessons on their classes. The school's faculty handbook guides instructors to "model and encourage spiritual maturity in students and to be available for spiritual counsel," but does not call for faculty to take any particular action to instill religion in their students. Liberty faculty are generally required to "exemplify Liberty's Christian worldview both inside and outside of the classroom." Dkt. 13-2 at 15–16.

### III.     ANALYSIS

#### A.     Liberty is a Religious Institution for the Purpose of the Ministerial Exception

In determining whether the ministerial exception applies, the Court must first decide whether Liberty is a "religious institution" within the meaning of the exception. *Conlon*, 777 F.3d at 833.

A "religious institution" for the purpose of the ministerial exception is one that has a mission "marked by clear or obvious religious characteristics." *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 310 (4th Cir. 2004). To be a religious institution for purpose of the ministerial exception, the institution need not be a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization. *See Conlon*, 777 F.3d at 834. Several universities have qualified. *See Yin*, 335 F. Supp. at 815 (collecting religious university cases). Liberty's stated mission is to "encourage students to embrace Christ and Christian values." Dkt. 13-1 at 14. Liberty has a governing Doctrinal Statement that lays out specific theological beliefs and a code of conduct that requires students to act in accordance with Liberty's doctrinal values. *Id.; see Yin*, 335 F. Supp. 3d at 815 ("Thus, since [the university] 'trains Christians' and 'educates people from a

biblical worldview,' it is a religious group under the ministerial exception because it possesses 'obvious religious characteristics.'").

In short, Liberty has a stated religious purpose and numerous policies that further that religious purpose. Furthermore, Palmer has not made any arguments on this point. Therefore, the school is a "religious institution" for the purpose of the ministerial exception.

### B. Palmer was not a Minister Within the Meaning of the Exception

The second issue is whether Palmer was a "minister" under the exception. The Supreme Court has developed a functional analysis to determine which employees at religious organizations are "ministers." In *Hosanna-Tabor*, the Court laid out four non-exhaustive considerations: (1) how the employer held out the employee, including her title, (2) whether the employee had undergone significant religious training, (3) how the employee held herself out, and (4) what functions the employee performed. *Hosanna-Tabor*, 565 U.S. at 190–192. In *Our Lady of Guadalupe*, the Court emphasized this last factor: "What matters, at bottom, is what an employee does." *Our Lady of Guadalupe*, 140 S. Ct.. at 2064. The Court also noted in *Our Lady of Guadalupe* that none of those four considerations were dispositive, nor would they always be relevant—they are not "factors to be assessed and weighed in every case." *Id.* at 2068. Thus, while the Court must undertake a fact-specific analysis of Palmer's title, training, self-regard, actions, it may also consider any other relevant considerations to determine whether she was a "minister" within the exception.

#### 1. How Liberty Held Palmer Out

The first consideration from *Hosanna-Tabor* is how the employer held out the employee, including her title. Every position that Palmer held at Liberty had a secular title. Dkt. 15-1 at ¶ 27. Her final title was Professor of Art. *Id.* Liberty never referred to her as a "minister,"

"chaplain," "pastor," or any other similar term. *Id.* at ¶ 14. Nor did she ever teach in one of Liberty's schools that provide courses in clearly ministerial subjects, such as the School of Divinity or the Religion Department. *Id.* at ¶¶ 31–32. Rather, she taught in the School of Visual and Performing Arts. *Id.* at ¶ 29. In addition, nothing in Palmer's job description referred to ministerial duties. *See* Ex. C, D, and E to Dkt. 15. When the Liberty put up a job posting to replace her, the position called for "expertise in one of more of the following: graphic design, motion graphics, UI/UX design, responsive web design, and game design with some experience in studio art." Ex. C to Dkt. 15.

In its briefs, Liberty notes that it requires all faculty to "exhibit commitment to Christian principles and integrate the Christian worldview in the classroom." Dkt. 13-1 at 17. Liberty states that all faculty must abide by the school's faith-based policies, which are incorporated into the school's Doctrinal Statement and individual faculty members' employment agreements. *Id.* at 17–18. Because Palmer agreed to abide by the school's policies, Liberty argues that the policies should factor into the Court's determination of whether she is a minister. *See id.*

The first consideration weighs in Palmer's favor. Her title was secular, and no evidence in the record suggests that Liberty regarded her as a minister until litigation in this case commenced. While an employee can still be a "minister" under the exception without being specifically titled as one, nothing about Palmer's job title or the way that Liberty held her out indicates that she was a minister.

### 2. Palmer's Religious Training

The second consideration from *Hosanna-Tabor* is whether the employee has undergone "significant religious training." *Hosanna-Tabor*, 565 U.S. at 193. Here, Palmer holds no degrees in religion, theology, or ministry, and none of her positions at Liberty required her to have one.

Dkt. 15-1 at ¶¶ 6, 23. She holds a bachelor's degree in education, and two master's degrees in fine art. *Id.* at ¶¶ 3–6. She has taken some religious courses in non-degree settings, including at Liberty, but those courses were for her personal development, not to train as a minister. Dkt. 22 at 5.

Liberty emphasizes Palmer's non-degree coursework, her "informal" religious training, and the religious training that Liberty requires of all faculty members. First, Liberty notes that Palmer took some courses in Liberty's Doctor of Ministry program around 2015 and 2016. Dkt. 13-1 at 7. Second, Liberty argues that Palmer is "informally qualified" as a minister because she is a devout Christian. *Id.* at 16. Liberty points to the fact that Palmer has been a "Christian since grade school." *Id.* Liberty further notes that during her time at Liberty, she "attended church, convocation, Christian missions, Christian-based conferences, and even a faith-driven archaeological dig in Israel." *Id.* Third, Liberty argues that all Liberty faculty members are required to undergo training on "how to integrate a Christian worldview in their respective disciplines." *Id.* at 3. Liberty also asserts that all faculty members are hired partially based on their religious convictions and knowledge (*id.* at 16), but the present system for screening applicants on those bases was not in place when Liberty hired Palmer in 1986. Dkt. 22 at 3.

The second consideration weighs neutrally. On the one hand, Palmer holds no degrees in religion, theology, or ministry. On the other hand, she took some graduate-level coursework in those areas at Liberty and participated in some religious trainings each semester as part of her professional development. The Court does not credit Liberty's argument that Palmer's personal religious devotion and experience somehow constitutes "informal qualification" as a minister. The controlling cases clearly indicate that what is important is formal religious training in preparation for a ministerial role, not personal devotion. *See Hosanna-Tabor*, 565 U.S. at 191

("*To be eligible to become a commissioned minister*, Perich had to complete eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher.") (emphasis added). No court has held that personal devotion constitutes formal religious training.

### 3. How Palmer Held Herself Out

The third consideration from *Hosanna-Tabor* is "how the employee held herself out." *Hosanna-Tabor*, 565 U.S. at 194. Palmer emphatically argues that she did not consider herself a minister. In a deposition, she stated: "I'm not a minister. I'm sorry. I'm not a minister. I'm not ordained. I'm not licensed. I'm not legally licensed. I'm not a minister." Ex. B to Dkt. 22 at 28. Palmer further asserts that she does believe that women can be ministers at all, stating that "[s]cripturally, it says not to." *Id.*; *see also* Leslie C. Griffin, The Sins of Hosanna-Tabor, 88 IND. L.J. 981, 1007 (2013). ("One irony and injustice in the ministerial rule is that female employees of denominations that do not ordain ministers suddenly become ministers at the moment they file[] a lawsuit.")

Palmer argues that while she might have held herself out as a "Christian teacher," she did not regard herself as a "teacher of Christianity." Dkt. 22 at 5. The record supports the fact that Palmer sought to model Christian virtues in her role as a Professor because of her personal belief system, but it is less clear whether and to what extent she sought to impart specifically theological lessons in her classes. In a deposition, she differentiated between what she saw as her role as a Christian person who taught art and Liberty's purported version of her as a teacher of religion: "Did I talk specifically about Christianity? No. Being a person of faith and living accordingly is different in a sense, in a broad sense, to teaching or talking about Christianity during your classes with students." Ex. B to Dkt. 22 at 57–59.

Liberty argues that Palmer did regard herself as ministering to her students in her classes and as part of her broader professional duties. Liberty cites to an essay (titled a "Christian Philosophy of Education") that Palmer wrote as part of one of her religion courses at Liberty. Dkt. 13-1 at 20; Ex. F to Dkt. 13 at ¶ 21. In the essay, Palmer wrote that "[t]he purpose of Christian education is that the student may know God and do His will." Ex. F to Dkt. 13 at ¶ 21. She contrasted her view of Christian education with her view of secular education: "Central in secular education is the study of man and his environment. Sociology, anthropology, social sciences and natural sciences are given priority. In Christian education, God, the Bible and God's requirements are central." *Id.* Liberty concludes that this essay indicates that Palmer regarded herself as a minister, and not just a teacher of a purely secular subject. Dkt. 13-1 at 20.

The third consideration, how the employee held herself out, weighs in favor of Palmer. Palmer asserts that she does not believe that women can serve as ministers. Accordingly, she has never referred to herself as one. The record supports that while she sees herself as a "Christian teacher," she does not see herself as a "teacher of Christianity"—i.e., while she sought to model Christian virtues, she did not teach theological concepts. Liberty's citation to Palmer's essay on her philosophy of education is Liberty's only evidence that Palmer regarded herself as holding a ministerial role. While the essay does suggest that Palmer saw her teaching duties as something more than purely secular, it does not indicate that she saw herself as a minister, especially in the absence of any evidence that she actually incorporated the ideas in the essay into her day-to-day teaching.

### 4. Palmer's Job Functions

The fourth consideration from *Hosanna-Tabor* is what functions the employee performed. *Hosanna-Tabor*, 565 U.S. at 193–194. The Supreme Court emphasized the primacy of this consideration in *Our Lady of Guadalupe*: "What matters, at bottom, is what an employee does." 140 S. Ct. at 2064. Palmer states that her primary job duty was to teach art classes. Dkt. 15 at 4-5. She did not teach any type of religious curriculum, such as Bible-study, theology, religion, or ministry. *Id.* at 5. She contrasts her duties with those of the plaintiffs in *Hosanna-Tabor* and *Our Lady of Guadalupe*, who were primary school teachers who taught theology-specific courses for at least part of the day. *Id.* at 11. Unlike the plaintiffs in those cases, she never taught theology-specific courses; at most, she asserts, she modelled some Christian values in the course of her secular teaching duties. *See id.* at 11–12.

Liberty argues first on this point that Palmer prayed with students and started each class session with a prayer. Dkt. 13-1 at 18. Palmer concedes that she began classes with a prayer. Dkt. 15 at 5. Second, Liberty argues that Palmer attended convocation with her students. Dkt. 13-1 at 18. However, unlike the plaintiffs in *Our Lady of Guadalupe*, Palmer did not *take* her students to worship services, but rather happened to attend university-wide worship services at the same time as her students. Dkt. 15 at 5. Third, Liberty argues that Palmer "incorporated Christian principles in the classroom while integrating art and the Bible." Dkt. 13-1 at 19. Liberty argues that Palmer periodically incorporated religious lessons into her art classes and sought to develop a Master of Fine Arts program which would "integrate a Christian worldview into best practices for creating visual imagery." *Id.* at 3. Fourth, Liberty extensively cites to its employment handbook and Palmer's employment agreements to argue that Palmer had religious duties; Liberty argues that the handbook and agreements signify that Palmer had a duty to

14

"integrate" Christian ministry into her art lessons. *Id.* at 4. However, Liberty provides scant evidence of her actually integrating theological lessons into her classes, instead asserting generally that she did so. *See id.*

On balance, this consideration weighs in Palmer's favor. The core function of Palmer's job, teaching art classes, was secular in nature. Although she led students in prayer before class, the evidence in the record does not support that she did anything more ministerial, such as taking students to church services or giving religious lessons.

Liberty's evidence about its employee handbook and Palmer's employment agreement is only truly relevant to the extent that Palmer acted consistently with them. The question is not what Palmer was supposed to do or encouraged to do, but what she actually did. *See Our Lady of Guadalupe*, 140 S. Ct. at 2064. Liberty cannot point to its voluminous policies about faculty responsibilities as evidence that Palmer undertook ministerial functions; it must provide evidence of her undertaking ministerial actions. It has not put that evidence into the record.

The exact issue at hand here—whether Liberty encouraging Palmer to integrate religious instruction into her curriculum rendered her a minister—was the main issue in the Supreme Judicial Court of Massachusetts's recent decision in *DeWeese-Boyd v. Gordon College*, 163 N.E.3d 1000 (Mass. 2021). *DeWeese-Boyd* held that the ministerial exception did not apply to a religious college's decision to terminate a sociology professor. The arguments that Liberty makes in this case closely echo the arguments that Gordon College made in that case. Gordon College requires faculty to adhere to a Statement of Faith and certain behavioral standards, much like Liberty does. *DeWeese-Boyd*, 163 N.E.3d at 1004. Gordon College requires faculty to integrate a "Christian worldview" into their curriculums, much like Liberty does. *Id.* at 1005. Both schools expect, but do not explicitly require, that faculty will attend school-sponsored

15

religious services. The plaintiffs in both cases engaged in some sort of personal religious study, which the schools argued informally qualified them as ministers. *Id.* And Gordon College's employment contracts did not "explicitly provide for any spiritual responsibilities," just as Liberty's faculty handbook and Palmer's employment agreement did not. *Id.* at 1008.

In holding that the plaintiff was not a minister within the meaning of the exception, the Court emphasized that she "was not required to, and did not, teach classes on religion, pray with her students, or attend chapel with her students, like the plaintiffs in *Our Lady of Guadalupe* . . . nor did she lead students in devotional exercises like the plaintiff in *Hosanna-Tabor*." *Id.* at 1012. The Court further emphasized that she was "first and foremost, a professor of social work." *Id.* However, the Court noted the difficult question posed by Gordon College's requirement that the plaintiff integrate a Christian worldview into her curriculum. The plaintiff acted consistently with that requirement by "submitting scholarship on secular topics, teaching students about connections between course material and the Christian faith, and reflecting on the role of Christian scholarship in the 'decidedly nonsectarian' field of social work." *Id.* at 1013. The Court noted that "[t]he Supreme Court has not specifically addressed the significance of the responsibility to integrate religious faith into instruction and scholarship that would otherwise not be considered ministerial" in its prior ministerial exception cases, leaving the issue up to lower courts to settle. *Id.* at 1002. The Court ultimately held that the plaintiff's "responsibility to integrate the Christian faith into her teaching, scholarship, and advising was different in kind, and not degree, from the religious instruction and guidance at issue in *Our Lady of Guadalupe* and *Hosanna-Tabor*." *Id.* at 1013.

The similarities between Palmer's case and *DeWeese-Boyd* are substantial. As Palmer notes in one of her pleadings:

> Ms. Palmer did not teach religion or Bible study; she did not have any specialized training to teach religion or Bible study; none of her curricula or syllabi said she would be teaching the faith or religion; none of her curricula or syllabi said she that prayer or worship was part of the course of study; she did not lead chapel or worship services; she did not take her students religious services, and she was not required to pray or worship with her students.

Dkt. 22 at 21. It would be a significant expansion of the conception of the ministerial exception in *Our Lady of Guadalupe* to hold that a teacher's mere obligation to integrate a Christian worldview into her curriculum is part of what she "does," especially in a case with limited evidence of the teacher actually integrating a Christian worldview into her curriculum.

Some of the few other school-based ministerial exception cases decided in the wake of *Our Lady of Guadalupe* are also instructive. In *Ostrander v. St. Columba School*, the Southern District of California held that the ministerial exception did not apply where the school's primary evidence was what the teacher was "*supposed* to do, not what she *actually* did." *Ostrander v. St. Columba School*, No. 3:31-cv-175, 2021 WL 2054877 *6 (S.D. Cal. July 19, 2021) (emphasis in original). While Liberty has provided some evidence of what Palmer "did," Liberty similarly relies primarily on what Palmer was "supposed to do" as evidenced by the faculty handbook and her employment agreement. In *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195 (S.D. Ind. 2020), the Court held that the ministerial exception did not apply to an elementary school's decision to fire a long-time employee who had served as a teacher of religion, music, and drama as well as a guidance counselor over her career at the school based on the employee's sexual orientation. The Court's analysis centered on the teacher's overwhelmingly secular daily responsibilities, and the fact that the employee did not engage students in prayer or worship as the teachers in *Our Lady of Guadalupe* did. Palmer's daily functions were similarly overwhelmingly secular. *See id.*

17

## IV. CONCLUSION

For the reasons stated, the Court holds that Palmer was not a minister within the meaning of the ministerial exception during her employment at Liberty, so the ministerial exception does not bar her claim. Therefore, the Court **GRANTS** Palmer's motion for summary judgment on the issue of the ministerial exception, Dkt. 14, and **DENIES** Liberty's motion, Dkt. 13.

It is so **ORDERED**.

The Clerk of Court is directed to send this Order to all counsel of record.

ENTERED this 1st day of December, 2021.

*[Signature]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE